**ON REHEARING EN BANC**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RICHMOND MEDICAL CENTER FOR
WOMEN; WILLIAM G. FITZHUGH,
M.D., on behalf of themselves,
their staffs, and their patients,

        *Plaintiffs-Appellees,*

        v.

MICHAEL N. HERRING, in
his official capacity as
Commonwealth Attorney for the
City of Richmond; WADE A.
KIZER, in his official capacity as
Commonwealth Attorney for the
County of Henrico,

        *Defendants-Appellants.*

No. 03-1821

HORATIO R. STORER FOUNDATION,
INCORPORATED; ROBERT G.
MARSHALL, Virginia Delegate;
KATHY J. BYRON, Virginia
Delegate; M. KIRKLAND COX,
Virginia Delegate; THOMAS D.
GEAR, Virginia Delegate; WILLIAM
J. HOWELL, Virginia Delegate;
TIMOTHY D. HUGO, Virginia
Delegate;

L. SCOTT LINGAMFELTER, Virginia Delegate; SAMUEL A. NIXON, JR., Virginia Delegate; BRENDA L. POGGE, Virginia Delegate; R. LEE WARE, JR., Virginia Delegate; JILL HOLTZMAN VOGEL, Virginia Senator; TOM A. COBURN, U.S. Senator; THE AMERICAN CENTER FOR LAW AND JUSTICE,

*Amici Supporting Appellants,*

PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; VANESSA E. CULLINS, Vice President for Medical Affairs, Planned Parenthood Federation of America; FORTY-TWO INDIVIDUAL PHYSICIANS; NATIONAL ABORTION FEDERATION; AMERICAN MEDICAL WOMEN'S ASSOCIATION; ASSOCIATION OF REPRODUCTIVE HEALTH PROFESSIONALS; MEDICAL STUDENTS FOR CHOICE; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH,

*Amici Supporting Appellees.*

RICHMOND MEDICAL CENTER FOR
WOMEN; WILLIAM G. FITZHUGH,
M.D., on behalf of themselves,
their staffs, and their patients,

Plaintiffs-Appellees,

v.

MICHAEL N. HERRING, in
his official capacity as
Commonwealth Attorney for the
City of Richmond; WADE A.
KIZER, in his official capacity as
Commonwealth Attorney for the
County of Henrico,

Defendants-Appellants.

No. 04-1255

HORATIO R. STORER FOUNDATION,
INCORPORATED; ROBERT G.
MARSHALL, Virginia Delegate;
KATHY J. BYRON, Virginia
Delegate; M. KIRKLAND COX,
Virginia Delegate; THOMAS D.
GEAR, Virginia Delegate; WILLIAM
J. HOWELL, Virginia Delegate;
TIMOTHY D. HUGO, Virginia
Delegate;

L. SCOTT LINGAMFELTER, Virginia
Delegate; SAMUEL A. NIXON, JR.,
Virginia Delegate; BRENDA L.
POGGE, Virginia Delegate; R. LEE
WARE, JR., Virginia Delegate; JILL
HOLTZMAN VOGEL, Virginia
Senator; TOM A. COBURN, U.S.
Senator; THE AMERICAN CENTER FOR
LAW AND JUSTICE,

  *Amici Supporting Appellants,*

PHYSICIANS FOR REPRODUCTIVE
CHOICE AND HEALTH; VANESSA E.
CULLINS, Vice President for
Medical Affairs, Planned
Parenthood Federation of America;
FORTY-TWO INDIVIDUAL PHYSICIANS;
NATIONAL ABORTION FEDERATION;
AMERICAN MEDICAL WOMEN'S
ASSOCIATION; ASSOCIATION OF
REPRODUCTIVE HEALTH
PROFESSIONALS; MEDICAL STUDENTS
FOR CHOICE; PHYSICIANS FOR
REPRODUCTIVE CHOICE AND HEALTH,

  *Amici Supporting Appellees.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-03-531-3)

Argued: October 28, 2008

Decided: June 24, 2009

Before WILLIAMS, Chief Judge, and WILKINSON, NIEMEYER, MICHAEL, MOTZ, TRAXLER, KING, GREGORY, SHEDD, DUNCAN, and AGEE, Circuit Judges.

---

Reversed by published opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Williams and Judges Wilkinson, Shedd, Duncan, and Agee joined. Judge Wilkinson wrote a separate concurring opinion. Judge Michael wrote a dissenting opinion, in which Judges Motz, Traxler, King, and Gregory joined.

---

## COUNSEL

**ARGUED:** William Eugene Thro, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Stephanie Toti, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees. **ON BRIEF:** Robert F. McDonnell, Attorney General of Virginia, Stephen R. McCullough, State Solicitor General, William C. Mims, Chief Deputy Attorney General, David E. Johnson, Deputy Attorney General, Maureen Riley Matsen, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Janet Crepps, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees. Patrick M. McSweeney, MCSWEENEY, CRUMP, CHILDRESS & TEMPLE, P.C., Richmond, Virginia; Mailee R. Smith, Denise M. Burke, AMERICANS UNITED FOR LIFE, Chicago, Illinois, for Virginia Delegates Robert G. Marshall, Kathy J. Byron, M. Kirkland Cox, Thomas D. Gear, William J. Howell, Timothy D. Hugo, L. Scott Lingamfelter, Samuel A. Nixon, Jr., Brenda L. Pogge, and R. Lee Ware, Jr., and Virginia Senator Jill Holtzman Vogel, and U.S. Senator Tom

A. Coburn, Amici Supporting Appellants. Jay Alan Sekulow, Stuart J. Roth, James M. Henderson, Sr., Walter M. Weber, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C.; Shannon Demos Woodruff, Kristina J. Wenberg, AMERICAN CENTER FOR LAW & JUSTICE, Virginia Beach, Virginia, for The American Center for Law and Justice, Amicus Supporting Appellants. Kimberly A. Parker, Katherine A. Gillespie, WILMER CUTLER PICKERING HALE AND DORR, L.L.P., Washington, D.C.; Talcott Camp, Reproductive Freedom Project, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for National Abortion Federation, American Medical Women's Association, Association of Reproductive Health Professionals, Medical Students for Choice, and Physicians for Reproductive Choice and Health, Amici Supporting Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

In this case, we consider whether Virginia's "Partial Birth Infanticide" Act, Va. Code Ann. § 18.2-71.1 (the "Virginia Act"), is facially unconstitutional.

After the Commonwealth of Virginia enacted the Virginia Act in April 2003, but before its July 1, 2003 effective date, Richmond Medical Center and its owner and medical director, Dr. William Fitzhugh (collectively, "Dr. Fitzhugh"), commenced this action to declare the Act unconstitutional and to enjoin its enforcement. The complaint alleged that the Act (1) impermissibly failed to include an exception for the preservation of the mother's health, and (2) defined the term "partial birth infanticide" "so broadly as to ban the safest and most common second trimester method of abortion, the [standard] dilation and evacuation ("D&E") method, and thus [to]

impose an undue burden on the woman's ability to choose abortion."

The district court preliminarily enjoined enforcement of the Virginia Act and thereafter entered summary judgment in favor of Dr. Fitzhugh, declaring the Virginia Act unconstitutional on both grounds alleged by the plaintiffs and permanently enjoining its enforcement. *Richmond Medical Center for Women v. Hicks*, 301 F. Supp. 2d 499, 512-18 (E.D. Va. 2004). On appeal, we affirmed by a divided court, *Richmond Medical Center for Women v. Hicks*, 409 F.3d 619 (4th Cir. 2005), and the Commonwealth filed a petition in the Supreme Court for a writ of certiorari.

While this case was pending in the Supreme Court, the Supreme Court decided *Gonzales v. Carhart*, 550 U.S. 124 (2007), and held, in the face of similar constitutional challenges, that the federal partial-birth abortion statute, 18 U.S.C. § 1531 (the "Federal Act"), which is similar but not identical in language to the Virginia Act, was facially constitutional. Following its decision in *Gonzales v. Carhart*, the Supreme Court granted Virginia's petition for a writ of certiorari in this case, vacated our judgment holding the Virginia Act unconstitutional, and remanded this case for reconsideration in light of *Gonzales v. Carhart. See Herring v. Richmond Medical Center for Women*, 550 U.S. 901 (2007).

On remand, relying on the distinction between the scienter language in the Federal Act and the scienter language in the Virginia Act, we again held the Virginia Act unconstitutional because it "imposes criminal liability on a doctor who sets out to perform a *standard* D&E that *by accident* becomes [a prohibited] *intact* D&E, thereby exposing all doctors who perform standard D&Es to prosecution, conviction, and imprisonment." *Richmond Medical Center for Women v. Herring*, 527 F.3d 128, 131 (4th Cir. 2008) (emphasis added). On the Commonwealth's motion, we voted to rehear this case en

banc, thus vacating the three-judge panel decision. *See* Local Rule 35(c).

We now conclude that insofar as Dr. Fitzhugh mounts a facial challenge against the Virginia Act, the challenge fails because (1) Dr. Fitzhugh's posited circumstance does not present a sufficiently frequent circumstance to render the Virginia Act wholly unconstitutional for all circumstances; (2) the Virginia Act's scienter language, although different from the Federal Act, nonetheless provides sufficient notice to a reasonable doctor of what conduct is prohibited by the statute; and (3) the provisions for a safe harbor and affirmative defenses, as well as the requirement of "an overt act," ensure that the Virginia Act will not create a barrier to, or have a chilling effect on, a woman's right to have a standard D&E or her physician's ability to undertake that procedure without fear of criminal liability. Insofar as Dr. Fitzhugh purports to mount an as-applied challenge, we conclude that he has not presented sufficiently concrete circumstances in which the as-applied challenge can be resolved, recognizing that "[t]he Act is open to a proper as-applied challenge in a discrete case." *Gonzales v. Carhart*, 550 U.S. at 168. Accordingly, we reverse the judgment of the district court.

I

Effective July 1, 2003, Virginia enacted the "Partial Birth Infanticide" Act, which prohibits "kill[ing] a human infant" "who has been born alive," *i.e.*, who has been "completely or substantially expelled or extracted from its mother." Va. Code Ann. § 18.2-71.1(A)-(C).[1] The Virginia Act provides that an

---

[1]The text of these provisions read:

A.  Any person who knowingly performs partial birth infanticide and thereby kills a human infant is guilty of a Class 4 felony.

B.  For the purposes of this section, "*partial birth infanticide*" means any deliberate act that (i) is intended to kill a human infant

infant is "substantially expelled or extracted from its mother" when its "entire head is outside the body of the mother" or, in a breech delivery, its "trunk past the navel is outside the body of the mother." *Id.* § 18.2-71.1(D).[2] As distinct from this prohibited procedure, known as "intact D&E," the Virginia Act excludes from its coverage numerous abortion procedures, including the "standard D&E," *i.e.*, "the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother." *Id.*

who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.

The term "*partial birth infanticide*" shall not under any circumstances be construed to include any of the following procedures: (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother, or (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.

C. For the purposes of this section, "*human infant who has been born alive*" means a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

Va. Code Ann. § 18.2-71.1(A)-(C).

[2]The text of this provision reads:

D. For purposes of this section, "*substantially expelled or extracted from its mother*" means, in the case of a headfirst presentation, the infant's entire head is outside the body of the mother, or, in the case of breech presentation, any part of the infant's trunk past the navel is outside the body of the mother.

Va. Code Ann. § 18.2-71.1(D).

§ 18.2-71.1(B); *see also Gonzales v. Carhart*, 550 U.S. at 134-36, 150.

In his complaint challenging the Virginia Act, Dr. Fitzhugh alleged that "[b]ecause of the Act's breadth and vagueness, the Virginia Commonwealth's Attorneys statewide may differ widely over what conduct they believe is proscribed by the Act. The Act thus subjects physicians to the risk of arbitrary and discriminatory prosecution." He also pointed out that the Act does not permit a physician "to protect a woman from damage to her health" inasmuch as the statute only contains exception to protect the woman's life. He summarized, "by prohibiting or severely restricting physicians from performing the most common, least expensive, and safest second trimester abortion procedures, the Act impermissibly restricts women's ability to obtain abortions."

The district court accepted Dr. Fitzhugh's arguments and ruled that the Virginia Act was facially unconstitutional and enjoined its enforcement. 301 F. Supp. 2d at 517. The court concluded that the Act is unconstitutional "because it fails to contain a health exception," *id.* at 513, and because the Act "places an undue burden on women's constitutional right to choose an abortion" by banning "pre-viability D&E's" and by "caus[ing] those who perform such D&E's to fear prosecution, conviction and imprisonment," *id.* at 515.

After the district court entered judgment and we affirmed, the Supreme Court decided *Gonzales v. Carhart*, 550 U.S. 124, rejecting similar challenges to the Federal Act, 18 U.S.C. § 1531. On remand of this case from the Supreme Court, Virginia and Dr. Fitzhugh filed supplemental briefs adjusting their arguments in light of *Gonzales v. Carhart*.

The record in this case shows that each year, Dr. Fitzhugh performs about 4,000 first-trimester abortions and about 225 second-trimester abortions. For second-trimester abortions, Dr. Fitzhugh usually uses the standard D&E method in which

the mother's cervix is dilated for 24 hours and then the fetus is evacuated from the mother in parts. As the Supreme Court explained in *Gonzales v. Carhart*, a doctor performing a standard D&E procedure can take from 10 to 15 passes through the uterus to remove all of the parts. *See Gonzales v. Carhart*, 550 U.S. at 150-51. The Court distinguished the "standard D&E" from an "intact D&E" because in a standard D&E, "the doctor intends to remove the fetus *in parts* from the outset." *Id.* at 151 (emphasis added).

Dr. Fitzhugh testified that in his practice, between 75 to 85% of the second-trimester abortions he performs are standard D&E procedures. "Occasionally," he might use other procedures. But "rarely" does a fetus emerge "intact" to the anatomical landmarks of the Federal and Virginia Acts. He estimated such an accidental emergence of the fetus occurs 10% of the time, but he was unable to cite any instance of the scenario occurring within the previous month or even the previous year. Even more rare, "less than one-half percent" of the time, according to Dr. Fitzhugh, the fetus emerges to the anatomical landmark up to its neck and its head becomes lodged in the woman's cervix. In that circumstance, Dr. Fitzhugh crushes the fetal skull to remove the fetus, because otherwise, the "woman's life would be at risk." If an intact fetus emerged head first through the cervix, it would be delivered intact, and the Act would require that it not be deliberately destroyed. Dr. Fitzhugh explained, however, that in performing standard D&Es, he does not see head-first deliveries of an intact fetus, presumably because his standard D&E procedure involves only 24 hours of dilation.

Describing his practice generally, Dr. Fitzhugh testified that he always *intends* to do the standard D&E procedure—in which the fetus is removed in parts. "Very rarely do you get a whole—you do get a whole fetus out sometimes, but that's very rare." But Dr. Fitzhugh contends that when he does receive an intact fetus, he "cannot know at the outset of a standard D&E procedure whether [the] prohibited procedure

will result." He asserts that if the Virginia Act were to take effect, "[his] only options would be to cease performing standard D&E procedures or to violate the Virginia Ban and then challenge its constitutionality in a criminal enforcement proceeding."

II

Dr. Fitzhugh argues principally that the Virginia Act is facially unconstitutional because it imposes an undue burden on a woman's ability to have an abortion using the standard D&E method. He asserts that the standard D&E method is the most common and safest method for a second-trimester abortion and that the Virginia Act, unlike the Federal Act, imposes criminal liability for the performance of an "accidental" intact D&E—*i.e.*, for "procedures that are intended to result in *standard* D&Es but inadvertently result in *intact* D&Es." Because of the alleged facial deficiencies in the Virginia Act, Dr. Fitzhugh contends that the district court was correct in finding a complete invalidation of the Act. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-30 (2006).

Virginia contends that the district court erred in invalidating the statute on its face, arguing (1) that the district court should not have entertained a facial challenge alleging overbreadth in the abortion context; (2) that "abortion statutes must be construed to avoid constitutional problems"; and (3) that "if an abortion statute has some constitutional applications, it should not be invalidated in all applications."

The Supreme Court has, as a policy matter, expressed a strong preference for avoiding facial challenges to statutes and has held, in the abortion context, that facial challenges should not be entertained except where the challenged statute "will operate as a substantial obstacle to a woman's choice to undergo an abortion" "in a large fraction of the cases in which [the statute] is relevant." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 895 (1992). The record in this

case does not satisfy that standard as Dr. Fitzhugh does not demonstrate that the Virginia Act criminalizes standard D&Es that accidentally become intact D&Es "in a large fraction of the cases in which [the Virginia Act] is relevant." *Id.* Additionally, the Virginia Act, while different from the Federal Act, which was upheld in *Gonzales v. Carhart*, nonetheless provides sufficient clarity as to what conduct is prohibited to enable a doctor of reasonable intelligence to avoid criminal liability. Accordingly, it does not impose an undue burden on a woman's right to choose an abortion and is therefore constitutional. We address these points in order.

### A

With increasing frequency, the Supreme Court has expressed caution about determining the constitutionality of statutes in the context of facial challenges. *See, e.g.*, *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1191 (2008) (noting that facial challenges rest on speculation, run contrary to the principles of judicial restraint, and threaten to short circuit the democratic process). But the concern about an Article III court's role in addressing facial challenges to legislation, as distinct from as-applied challenges, has been debated from the beginning, as *Marbury v. Madison* implicitly recognized a dual role of courts, deriving from Article III. In *Marbury*, Chief Justice John Marshall stated that the courts are the ultimate interpreters of the Constitution responsible for declaring the supreme law of the land. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803). And where a legislature oversteps its bounds and issues a "law repugnant to the constitution," it is void and must be struck down by the courts. *Id.*

Article III, however, extends the jurisdiction of courts only to cases and controversies, thus precluding courts from issuing advisory opinions or opining on constitutional issues not before the court. Thus, the most basic functions of the court as interpreter of the Constitution and the ultimate arbitrator of

disputes exist in a tenuous balance meant to empower and simultaneously restrain the courts. *See* Richard H. Fallon, Jr., *Marbury and the Constitutional Mind: Bicentennial Essay on the Wages of Doctrinal Tension*, 91 Cal. L. Rev. 1, 34 (2003) (recognizing that "the tension between *Marbury*'s private-rights and special-functions faces emerges from even a cursory reflection on *Marbury* itself"). It is therefore not surprising that an apparent division has resulted between those cases in which constitutional challenges are mounted only to test a facial reading of the statute ("facial" challenges) and those cases in which constitutional challenges are mounted, based on a developed factual record and the application of a statute to a specific person ("as-applied" challenges).

The idea supporting facial challenges derives from the principle that "no one may be judged by an unconstitutional rule of law." Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 238 (1994). From that idea evolves the notion that courts can efficiently address constitutional concerns of a large group without engaging in the long and unwieldy process of case-by-case analyses. *See id.* at 277; *see also* David H. Gans, *Strategic Facial Challenges*, 85 B.U. L. Rev. 1333, 1352-53 (2005). And thus facial challenges are justified where as-applied adjudication is thought to be "inadequate to protect constitutional norms." Gans, 85 B.U. L. Rev. at 1337.

But Article III most centrally requires that a court begin with a case, and usually a case involving concrete facts and allegations of harm caused by the defendant that can be redressed by the court.

> The focus of concern must be whether the plaintiff is entitled to relief. To adjudicate a case, however, a court will invoke legal doctrine, typically as reflected in general rules, principles, or tests. Moreover, the application of doctrine—including the processes of reasoning necessary to resolve the dispute

—will sometimes unmistakably, even necessarily, yield the conclusion that a statute is invalid, not merely as applied to the facts, but more generally or even in whole. In such cases, facial invalidation occurs as an outgrowth of as-applied adjudication.

Richard H. Fallon, Jr. *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1337 (2000) (footnote omitted). But "[i]f a statute has valid applications and no harm occurs in using case-by-case adjudication, facial invalidation seems gratuitous." Gans, 85 B.U. L. Rev. at 1352.

Thus, slipping into the embrace of a facial challenge can tend to leave behind the limitations imposed by Article III and, indeed, to trample on legislative prerogatives, in violation of separation of powers principles. Moreover, as the Supreme Court has observed, "Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004).

Accordingly, the Supreme Court has, as a policy matter, expressed a strong preference for avoiding facial challenges. As the Court recently explained:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" Finally, facial challenges

threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"

*Washington State Grange*, 128 S. Ct. at 1191 (citations omitted); *see also* Fallon, *As-Applied and Facial Challenges*, 113 Harv. L. Rev. at 1331 (noting that the Supreme Court prefers "fact-specific, case-by-case decisions" because "full specification of the statute's meaning require[s] a series of judgments concerning the extent to which it should be read literally or purposively (for example, to avoid constitutional difficulties) and how it would apply to the gamut of imaginable fact situations"); *id.* at 1368 (noting that "the full meaning of a statute frequently is not obvious on the occasion of its first application").

The proper implementation of the Supreme Court's policy preference, however, has not been governed by well defined criteria. Because a facial challenge can result in finding an act wholly invalid, the Court has observed that the act cannot be found facially unconstitutional if it operates constitutionally in some circumstances. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Thus the Court announced that "the [facial] challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [challenged] Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.* Yet when the Court considered a facial challenge to Pennsylvania's Abortion Control Act, it applied a somewhat different standard, without mentioning *Salerno*, stating that because "in a large fraction of the cases," the Pennsylvania statute "will operate as a substantial obstacle to a woman's choice to undergo an abortion," the statute is facially invalid. *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 895 (1992). But after *Casey*, the Court

again considered, in a more complete analysis, the appropriate circumstances under which a court should entertain a facial challenge to a statute:

> Under *United States v. Salerno*, 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.*, that the law is unconstitutional in all of its applications. While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a "'plainly legitimate sweep.'"

*Washington State Grange*, 128 S. Ct. at 1190 (alteration in original) (citations omitted); *see also Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1623 (2008) (Stevens, J., plurality opinion) (reciting the standard that a statute must lack "a plainly legitimate sweep").

Urging us to apply the "no set of circumstances" or the "plainly legitimate sweep" standard, the Commonwealth of Virginia contends in its brief that the difference between the two is more theoretical than substantive—resting on a difference between "always unconstitutional and almost always unconstitutional." We need not, however, attempt to resolve the uncertainty regarding the appropriate criteria for entertaining facial challenges in this case, because, as we explain, Dr. Fitzhugh cannot successfully mount a facial challenge to the Virginia Act even under the more relaxed "large fraction of the cases" test applied in *Casey*.

### B

Under the *Casey* standard, Dr. Fitzhugh must show that the Virginia Act is unconstitutional in criminalizing standard D&Es that accidentally become intact D&Es "in a large fraction of the cases in which [the Virginia Act] is relevant."

*Casey*, 505 U.S. at 895. This showing is not sufficiently supported by the record. As the Supreme Court has stated, an intact D&E is almost always a conscious choice and almost never accidental:

> The evidence also supports a legislative determination that an intact delivery is almost always a *conscious choice* rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. And intact D&E is usually described as involving some manner of serial dilation.[3] Doctors who do not seek to obtain this serial dilation perform an intact D&E on far fewer occasions. *See, e.g.*, *Carhart*, 331 F. Supp. 2d, at 857-858 ("In order for intact removal to occur on a regular basis, Dr. Fitzhugh would have to dilate his patients with a second round of laminaria"). This evidence belies *any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E.*

*Gonzales v. Carhart*, 550 U.S. at 155 (emphasis added) (citations omitted).

The medical evidence in this case is nearly identical to that presented in *Gonzales v. Carhart*, where Dr. Fitzhugh was also a plaintiff and presented similar evidence. The record in this case reveals that generally, standard D&Es represent 96% of abortions after the first-trimester, and Dr. Fitzhugh testified that in his practice, standard D&Es represent 75 to 85% of his second-trimester abortions. Thus the vast majority of the procedures for performing second-trimester abortions involves standard D&Es in which doctors initiate dilation of the cervix

---

[3]The Supreme Court earlier described "serial dilation": "Doctors who attempt at the outset to perform intact D&E may dilate *for two full days* or use up to 25 osmotic dilators." *Gonzales v. Carhart*, 550 U.S. at 137 (emphasis added).

and, after a day or a day and a half, remove the fetus from the uterus in parts. In virtually every case where the head of the fetus emerges first, the doctor must crush the skull and thereafter remove the fetus in parts because the dilation is generally not sufficient to permit the head to pass. In cases involving a breech position, the doctors proceed similarly, removing the fetus in parts. Dr. Fitzhugh testified that in less than 0.5% of the cases, a fetus is presented in a breech position and accidentally emerges intact up to its head, at which point the head becomes lodged in the cervix. In those rare cases, Dr. Fitzhugh crushes the skull and completes the delivery. He testified that not doing so would risk the life of the mother.

It is the rare circumstance when the fetus in breech position emerges intact to its navel on which Dr. Fitzhugh relies to mount a facial challenge to the Virginia Act prohibiting the knowing performance of an intact D&E. But *Gonzales v. Carhart* requires that we evaluate the constitutionality of the Act and appropriateness of the facial challenge based on "all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications." 550 U.S. at 168. As the Court explained:

> It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to *each potential situation* that might develop. [I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.

*Id.* (alteration in original) (internal quotation marks omitted).

Yet, even in that rare circumstance identified by Dr. Fitzhugh, he need not violate the Virginia Act. Dr. Charles deProsse, Dr. Fitzhugh's expert witness, stated that when the

fetus appears at the cervix head first and passes the anatomical landmarks, there is never a need to perform an overt act to kill it, as it can simply be removed from the woman intact. And in the rare event that the fetus appears at the cervix in breech position and its skull becomes lodged in the cervix, the woman's life is in danger, as Dr. Fitzhugh testified, and the doctor may take any step within reasonable medical judgment that is necessary to prevent the mother's death. *See* Va. Code, § 18.2-71.1(E).[4]

As a result, there is little or no evidence in the record suggesting the inevitability of the "accidental" intact D&E abortion that would violate the Virginia Act, and to the extent that such a circumstance *might* arise in a rare case, the doctor has adequate alternatives so as to preclude a finding on a facial challenge that the statute is unconstitutional in "a large fraction" of the cases in which it is relevant. To hold the Virginia Act facially unconstitutional for all circumstances based on the possible rare circumstance presented by Dr. Fitzhugh is not appropriate under any standard for facial challenges.

C

Moreover, the Virginia Act, even though somewhat different from the Federal Act, nonetheless provides sufficient clarity as to what conduct is prohibited to enable a doctor of reasonable intelligence to avoid criminal liability under it, and therefore the Virginia Act is constitutional.

---

[4]The dissent argues that "this simply cannot be the purpose of the life exception" as it would "cancel out" the Virginia Act's prohibition against killing the fetus. *Post* at 52. Such an observation, however, overlooks the fact that even according to Dr. Fitzhugh, the circumstance when the head of a fetus delivered in breech position becomes lodged and thereby risks the mother's life is "rare." The Virginia Act's prohibition applies, of course, to the vast majority of other cases where the mother's life is not at risk.

The Federal Act applies to any physician who "knowingly[,] . . . deliberately and intentionally vaginally delivers a living fetus . . . for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus," and who "performs the overt act." 18 U.S.C. § 1531(a), (b). In *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Supreme Court upheld the Federal Act in part because it "requires the doctor deliberately to have delivered the fetus to an anatomical landmark," such that the doctor "will not face criminal liability if he or she delivers a fetus beyond the prohibited point by mistake." *Id.* at 149. If a doctor intends to perform a standard D&E and "intends to remove the fetus in parts from the outset, the doctor will not have the requisite intent to incur criminal liability" under the Federal Act. *Id.* at 151; *see also id.* at 155 ("If a doctor's intent at the outset is to perform a D&E in which the fetus would not be delivered to either of the Act's anatomical landmarks, but the fetus nonetheless is delivered past one of those points, the requisite and prohibited scienter is not present"). Thus, the Court in *Gonzales v. Carhart* found that the Federal Act's intent requirements "preclude liability from attaching to an accidental intact D&E," *id.* at 155, because "[i]f a living fetus is delivered past the critical point by accident or inadvertence, the Act is inapplicable." *Id.* at 148.

In contrast to the Federal Act, the language of the Virginia Act does not preclude such liability. Virginia Code § 18.2-71.1 applies to any person who "knowingly performs . . . any deliberate act that . . . is intended to kill a human infant" that has "been completely or substantially expelled or extracted from its mother." Va. Code § 18.2-71.1(A)-(C). Unlike the Federal Act, which defines "partial-birth abortion" as "deliberately and intentionally" delivering "a living fetus . . . for the purpose of perform[ing] an overt act" that kills it, 18 U.S.C. § 1531(a)-(b), the Virginia Act's scienter requirement does not attach to the delivery of the fetus. Rather, the Virginia Act's scienter requirement targets the "deliberate act" that kills "a human infant who has been born alive," Va. Code

§ 18.2-71.1(B). Whether the fetus is intentionally vaginally delivered or accidentally vaginally delivered is of no consequence. The Virginia Act's scienter is measured only after partial delivery of the "human infant who has been born alive" and not at the commencement of the abortion procedure, as under 18 U.S.C. § 1531. Because there is no "human infant who has been born alive" at the outset of any D&E procedure, whether standard or intact, the doctor's intent *before* commencing the D&E procedure is not determinative of scienter for purposes of criminal liability under the Virginia Act. The Virginia Act applies with equal force to a doctor who intends to perform a prohibited *intact* D&E procedure, intentionally extracts the fetus past an anatomical landmark, and then performs a "deliberate act" to kill the fetus, and to a doctor who intends to perform a permissible *standard* D&E procedure, accidentally extracts the fetus past an anatomical landmark, and then performs a deliberate act to kill the fetus and complete the abortion. In either event, however, we read the Virginia Act intent requirement to require purpose, not mere knowledge, that a specific act — taken after emergence to the anatomical landmark — will result in fetal demise. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality" (internal citation and quotation marks omitted)). Thus, the Virginia Act criminalizes both the intentional intact D&E and the accidental intact D&E, but only where the necessary scienter is present and no affirmative defense is presented.

Despite the fact that the Virginia Act is broader in scope than the federal statute, covering accidental intact D&Es, it is neither unconstitutionally vague nor unduly burdensome. The Virginia Act sufficiently cabins the narrow set of situations in which a doctor could incur criminal liability and therefore does not impermissibly chill the performance of allowed procedures. The Court in *Gonzales v. Carhart* clearly enunciates

the standard a statute must meet so as not to be unconstitutionally vague:

> The [federal] Act provides doctors "of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Indeed, it sets forth "relatively clear guidelines as to prohibited conduct" and provides "objective criteria" to evaluate whether a doctor has performed a prohibited procedure. *Posters 'N' Things[, Ltd. v. United States*, 461 U.S. 352,] 525–26 [(1994)]. Unlike the statutory language in *Stenberg[ v. Carhart*, 530 U.S. 914 (2000)], that prohibited the delivery of a "'substantial portion'" of the fetus—where a doctor might question how much of the fetus is a substantial portion—the Act defines the line between potentially criminal conduct on the one hand and lawful abortion on the other. *Stenberg*, 530 U.S. at 922 (quoting Neb. Rev. Stat. Ann. § 28-326(9) (Supp. 1999)). Doctors performing D&E will know that if they do not deliver a living fetus to an anatomical landmark they will not face criminal liability.

550 U.S. at 149.[5] Doctors, knowing when and how they might incur liability, need not be inhibited from performing permissible standard D&E procedures because the Virginia Act is plain as to how that liability may be avoided.

---

[5]While the dissent argues that the Supreme Court "upheld the federal statute based on its requirement that a doctor intend at the outset to perform an intact D & E," *post* at 35 (emphasis omitted), *Gonzales v. Carhart* actually notes that this intent-at-the-outset requirement merely buttressed the holding that the Federal Act gave notice to doctors of reasonable intelligence of what was prohibited. As we have pointed out, the imposition of the intent requirement at a point after the fetus has been expelled to the anatomical landmark, as contained in the Virginia Act, still provides this notice.

In the circumstances where a standard D&E results in a full, intact birth, the Virginia Act makes clear that a doctor will incur liability only if the doctor performs any deliberate act "intended to kill" the fetus that has just been completely expelled from the mother. Nothing in the record or the Act supports any doubt as to the actions a doctor may or may not take to avoid criminal liability if a complete expulsion of the fetus occurs.

The circumstance of a partial expulsion of a fetus from the mother presents a more complicated scenario under the language of the Virginia Act. But this scenario does not create any constitutional infirmity because the Act exempts a doctor from liability if the mother's life is in danger and makes clear to the doctor the permissible avenues for avoiding criminal liability. The record shows that in approximately 10% of standard D&E procedures, the fetus accidentally emerges intact to an anatomical landmark but is not completely expelled, sometimes because the fetus's head has become lodged in the cervix. But the record also shows that this situation will almost always endanger the mother's life. Although the Virginia Act ostensibly prohibits a doctor from taking a deliberate act intended to kill the fetus at this point in the abortion procedure—when the doctor is faced with an accidental intact D&E—the Act also allows the doctor to take reasonably necessary medical steps to preserve the mother's life. If the mother's life is in danger, the doctor may use "any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant." Va. Code § 18.2-71.1(E). Therefore, when the mother's life is at risk, as the record reflects is the case in the majority of such instances, the doctor may complete the D&E procedure in these cases to save the mother's life. In doing so, the doctor has an unequivocal affirmative defense to any criminal liability under the Virginia Act.

Finally, in the rare circumstance where the mother's life is not in danger and the fetus has been partially expelled to an anatomical landmark, the statute clearly prohibits the doctor from completing the abortion by taking a deliberate act to kill the fetus. In this circumstance, however, with the fetus at least partially expelled from the mother's body, the State's recognized interest in the life of the fetus must be counterbalanced against the mother's right to an abortion. *See Gonzales v. Carhart*, 550 U.S. at 157-58 (reaffirming that the State's "regulatory interest in protecting the life of a fetus" must "coexist" with a woman's right to have a pre-viability abortion without undue interference from the State). The Virginia Act reflects the State's legitimate interest in preserving the life of the fetus in this situation by allowing the doctor to attempt to safely complete delivery of the fetus. *See* Va. Code § 18.2-71.1(B). As long as the doctor takes no deliberate act intending to terminate the fetus's life, the Virginia Act shields the doctor from liability, even if the fetus dies during the delivery.[6] Moreover, if complications develop during delivery endangering the mother's life, the exception in § 18.2-71.1(E) would again apply. The statute makes clear when a doctor would incur liability in the event of delivery to an anatomical landmark, but also provides clear protocols for access to immunity for the physician.

Thus, Dr. Fitzhugh's concern that a doctor could incur liability under the Virginia Act for performing *any* act that ultimately kills the fetus, regardless of whether the doctor intends to kill the fetus or not, is unfounded. The Virginia Act, like the Federal Act, makes a clear distinction between the acts

---

[6]"The term 'partial birth infanticide' shall not under any circumstances be construed to include any of the following procedures: . . . (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered." Va. Code § 18.2-71.1(B). While the dissent argues that "[a]ny act taken [after expulsion to the anatomical landmark] that causes fetal demise is a deliberate act that violates the Virginia Act," *post* at 49, the Virginia Act is not so broad and makes clear that the doctor *must intend* that the act result in fetal demise.

necessary to deliver the fetus and the prohibited overt acts that destroy the fetus—a distinction found important in *Gonzales v. Carhart*. *See* 550 U.S. at 153 ("This distinction matters because, unlike intact D&E, standard D&E does not involve a delivery followed by a fatal act").

In the Virginia Act, a partial birth infanticide is defined as a "deliberate act that is intended to kill a human infant who *has been born alive*." Va. Code Ann. § 18.2-71.1(B) (emphasis added). The use of the present perfect tense indicates that the live birth, as defined in subsection (C) of the Virginia Act, must have taken place *prior* to the "deliberate act" that kills the fetus. Thus, the act that results in the demise and the emergence to the anatomical landmark cannot be one single action. Additionally, if the doctor acts to complete delivery, § 18.2-71.1(B) shields the doctor from liability, even if the doctor's acts ultimately kill the fetus. Likewise, if the doctor acts to prevent the death of the mother, § 18.2-71.1(E) also shields the doctor from liability if the doctor takes medically reasonable steps to preserve the life and health of the fetus, even if the doctor's acts ultimately kill the fetus. By its plain language, the statute provides for the distinction—between acts "intended to kill the fetus." Va. Code § 18.2-71.1(B), and acts performed to complete delivery or to prevent the death of the mother—that Dr. Fitzhugh argues is necessary to avoid vagueness or a chilling effect.

Moreover, the Supreme Court noted in *Gonzales v. Carhart* that "[t]he law need not give abortion doctors unfettered choice in the course of their medical practice," 550 U.S. at 163:

> The government may use its voice and its regulatory authority to show its profound respect for the life within the woman . . . Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its

> legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.

*Id.* at 157-58. Thus, in the rare circumstance where the fetus is partially expelled from the mother and the mother's life is not in danger, the Virginia Act clearly delineates when a doctor will incur liability, while, at the same time, extending protection to a fetus's life. This limited circumstance creates no barrier to, or chilling effect on, a woman's right to have a standard D&E or her physician's ability to undertake that procedure without fear of criminal liability.

## D

In short, the posited rare circumstance where a fetus accidentally emerges to an anatomical landmark intact and alive and its head then becomes lodged in the cervix has been noted by the Supreme Court to occur rarely, if ever—a fact supported also in the record here—and this fact makes a facial challenge on this basis improper. The possibility of this rare circumstance certainly does not justify rendering invalid the Virginia Act for all other circumstances.

Additionally, while the Virginia Act has a broader scope than the Federal Act, the Virginia Act is nonetheless constitutional. The Act clearly delineates the rare circumstances in which a doctor will incur liability, thus enabling a doctor to perform a standard D&E without fear that accidental emergence of the fetus to an anatomical landmark will present a Morton's fork, where the doctor must choose between criminal liability or care that the doctor believes is not in the best interest of the patient.

For these reasons, we reject Dr. Fitzhugh's facial challenge of the Virginia Act.

### III

In addition to mounting a facial challenge to the Virginia Act, Dr. Fitzhugh contends that he is mounting an as-applied challenge, although the Virginia Act has never been applied, nor threatened to be applied, to anyone and the record contains no concrete factual circumstance to which Dr. Fitzhugh can claim the Act applies unconstitutionally. He has not indicated that he has any particular patient in mind, nor any discrete factual circumstance that is detailed by medical records or other similarly concrete evidence. Moreover, Dr. Fitzhugh has testified generally that the circumstances in each of his cases are unique, and he cannot determine as a general matter how the Virginia Act might apply. As he testified:

> Like other physicians, I decide how to remove the fetus during a particular abortion procedure based on the clinical situation, the condition of the cervix and the uterus, the presentation and size of the fetus, the overall health of the patient, and other medical factors.

This record does not present the concrete facts necessary to create a live case or controversy so as to be able to show "that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the [Virginia] Act must be used." *Gonzales v. Carhart*, 550 U.S. at 167.

We have resolved Dr. Fitzhugh's facial constitutional challenges to the Virginia Act—challenges that might be assertable not only by him but also by others in his situation. But to go further and find the Virginia Act unconstitutional in particular factual circumstances requires a more complete and readily identifiable set of facts that can be evaluated and therefore that draws on a more nuanced application of the Virginia Act. We conclude that in this case, with its record, an as-applied challenge cannot be addressed.

For the reasons given, the judgment of the district court is

*REVERSED*.

WILKINSON, Circuit Judge, concurring:

I am happy to join Judge Niemeyer's fine opinion in this case. As the opinion mentions, the Supreme Court remanded our previous decision for "further consideration" in light of *Gonzales v. Carhart*, 550 U.S. 124 (2007). *Herring v. Richmond Med. Ctr. for Women*, 550 U.S. 901 (2007). It is doubtful that, by "further consideration," the Supreme Court meant avoiding the plain import of *Gonzales v. Carhart* and finding constitutional infirmities where none exist. To the contrary, proper reconsideration requires that we uphold Virginia's statute because it is similar in its critical respects to the federal statute upheld by the Supreme Court.

Indeed, there is substantial congruity between the two statutes. The Virginia statute applies to any person who "knowingly performs partial birth infanticide," Va. Code Ann. § 18.2-71.1(A), and the federal statute applies to any person who "knowingly performs a partial-birth abortion," 18 U.S.C. § 1531(a). Both statutes prohibit the same conduct: the delivery of a living fetus to the same anatomical landmarks, followed by an overt act (other than completing the delivery) that intentionally kills the fetus. And neither statute applies to a physician who completes the common (yet in many ways still disturbing) standard D&E procedure.

There is, to be sure, the one difference between the two statutes. If a physician intends at the outset to perform a standard D&E, and if the fetus is accidentally delivered intact to an anatomical landmark, and if the mother's life is not then at stake, then Virginia (but not federal) law forbids deliberately killing the fetus. Such a fine distinction does not change a constitutional statute into an unconstitutional one. The state's interest in protecting life recognized in *Gonzales v.*

*Carhart* does not vanish when the intact delivery of the child is unintentional. Instead, it follows from *Gonzales v. Carhart* that the state may decide that proscribing a gruesome procedure to end the life of a child that has been partially delivered intact—either purposefully or accidentally—outweighs opposing interests, except of course where the mother's life is in danger. The state may prohibit a deliberate and unconscionable act against the intact, partially born child, regardless of how the child got there.

Moreover, *Gonzales v. Carhart* makes clear that bringing a facial challenge in this case was inappropriate from the start. 550 U.S. at 167. *Carhart* pointedly cautions that we should not "resolve questions of constitutionality with respect to each potential situation that might develop." *Id.* at 168. Here, as in *Carhart*, we are asked to strike down a statute in its entirety based on nothing more than rare and speculative applications, none of which have been presented in this case with the concreteness necessary to support a facial or for that matter an as-applied attack. Indeed, the difference in application between the Virginia and federal statutes is hypothetical at best: the accidental emergence of the intact fetus to an anatomical landmark during a standard D&E is rare, to say the least. Virginia's statute is constitutionally valid in almost all foreseeable circumstances, and we should not overstep our institutional bounds to invalidate it based on the off chance that an unconstitutional scenario might someday develop.

Putting issues of statutory interpretation aside, I believe that the majority also correctly touches on a more important concern: that matters of such medical complexity and moral tension as partial birth abortion should not be resolved by the courts, with no semblance of sanction from the Constitution they purport to interpret. Indeed, the sheer mass of medical detail summoned in this case has led us far beyond the ambit of our own professional competence. And it obscures the central question. This is a brutal business for which we are asked to provide constitutional protection, and nothing in law or pre-

cedent requires that we do so. To explain that belief requires consideration of three time periods: past, present, and future.

*Past*

It is inconceivable that the founding generation or the drafters of the Fourteenth Amendment thought that their Constitution dealt with the subject of partial birth abortion. The text of the Constitution does not touch on partial birth abortion, much less sanctify it. There was nothing in the debates leading to the Constitution's or the Amendment's ratification that even approached the matter or anything fairly analogous to it. And if historical practice is any guide, our forebears would have been amazed to discover that the Constitution had whisked the issue of partial birth abortion from the legislative branch and through some mysterious process assigned it to the courts.

Indeed, it is unthinkable the Framers meant to put their imprimatur on a singularly controversial method of abortion so unconnected to those struggles that led to the formation of this nation. Nor does protection for this method of abortion find a foothold in the ideals of equality and liberation from bondage that motivated the conflict out of which the Fourteenth Amendment grew. It disrespects our forebears to make such inventions of their intentions and to invoke the greatness of their creation for ending the creation of a life halfway into this world.

*Present*

Controversy over abortion has raged in the decades since *Roe v. Wade*, 410 U.S. 113 (1973). In truth, the matter of early-term abortions is a difficult and intractable one. On one hand, the choice of a female to abort a fetus is not only intimate but agonizing. No one wants to see a ban drive young women into unsafe circumstances. I understand the argument too that a momentary lapse in judgment should not be the

occasion for severe burdens that may handicap a woman's education and career throughout life. *See Gonzales v. Carhart*, 550 U.S. at 171-72 (Ginsburg, J., dissenting). On the other hand, it is unsettling to tamper with the most sacred of life's cycles and disquieting for those here on earth to pull the ladder up on those who would join the human company. But it is one thing to say that abortions present difficult questions as a matter of policy, and quite another to say that those questions should be resolved as a matter of constitutional law.

Indeed, the very difficulty of the issue commends itself to legislative compromise. It is in representative bodies where those who support and those who oppose abortion have the best chance for an airing of their honest beliefs. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 1002 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part). Those who would strike Virginia's statute as unconstitutional would take from them that chance and allow the people little voice on an issue where moral, religious, and philosophical beliefs have taken such deep root.

The majority and dissenting opinions in this case agree that the state may proscribe an intact D&E—in which an intact fetus is partially delivered and then killed—that is intended from the outset. They disagree, however, as to whether the state may also proscribe deliberately killing a fetus if a standard D&E—in which the fetus is meant to be extracted from the uterus in pieces—accidentally becomes an intact D&E and if the life of the mother is not then in danger. To invalidate Virginia's statute on its face solely because it applies in this highly unusual circumstance is to say that courts have the ability not merely to create non-textual rights but to oversee their infinite permutations. To say further that the Virginia legislature cannot act to preserve humane ideals of protecting life not only traduces the views of past generations but denies present generations the opportunity to act upon the best and noblest of impulses.

*Future*

All civilizations will be measured in the fullness of time. Perhaps fine art, great invention, sustained prosperity, or enhanced longevity mark the quality of civilized life. Perhaps, I say, because there must be something more. How a society treats its most vulnerable members may do more than grandiosity to shape its lasting worth. A partially born child is among the weakest, most helpless beings in our midst and on that account exerts a special claim on our protection. So we can talk at length about facial challenges and as-applied challenges, and "standard D&E" procedures and "intact D&E" procedures, and "anatomical landmarks," and "disarticulation," and "fetal demise." And we can deploy this terminology to disguise what is happening, in the name of our founding document no less.

The future, however, will not be similarly misled. The fact is that we—civilized people—are retreating to the haven of our Constitution to justify dismembering a partly born child and crushing its skull. Surely centuries hence, people will look back on this gruesome practice done in the name of fundamental law by a society of high achievement. And they will shudder.

Others may see this issue differently, and they possess the means to enact their genuine convictions. As abhorrent as I find the procedure at issue, I would not deny the ability of democratic majorities to sanction it in law. It is the democratic process that enhances the mutual respect through law that both sides to this charged debate must work to achieve. But to jump from legislative enactment to constitutional edict is a leap too far. To say that our founding document and fundamental values affirmatively sanction this procedure—based on an argument over the precise timing of a doctor's intent to extinguish the existence of an emerging infant—is to invite coming generations to judge harshly the coldness of our ways.

My fine colleague in dissent expresses his view that this concurrence represents some disagreement on my part with the Supreme Court's abortion jurisprudence. *Post* at 59-60. I would remind him, however, that it is I who would follow the Supreme Court's clear instructions regarding the inadvisability of facial challenges and the Supreme Court's decision in *Gonzales v. Carhart* which *upheld* a federal statute closely akin to the one that my dissenting colleague would strike down.

The finale to my friend's dissent misses the point. This case is not about abortion generally, but rather the particular practice of partial birth abortion to which the Virginia statute addresses itself. As to this practice, I have no hesitancy in expressing my personal opposition, but only to underscore the point that I would respect completely a democratic judgment that runs contrary to my view. The dissent notes the moral complexity of the abortion issue, a proposition with which I agree. The dissent embraces certain of Dr. Fitzhugh's empirical assertions, the validity of which I am in no position to judge. But both the moral debate and the empirical assertions caution yet once more against the loss of all faith in our federal system, the foreclosure of prospects for legislative compromise, and the preemption of democratic liberty by the courts. And that is what in the last analysis this case is about: how the question of partial birth abortion is to be decided. It is wrong to recognize no discernible limits on the ability of courts to constitutionalize this heinous practice down to its last detail.

Such treatment of the truly helpless will not stand the test of time. Virginia's statute invokes the consent of the governed to soften the sting of the impending rebuke. Our invocation of precepts found nowhere in the Constitution's text or history will not provide us a comparable defense. Where the people's will and moral claims on behalf of the powerless are aligned, plying the Constitution to defeat both is a wrong future generations will not overlook. They will understand this inversion

of law's legitimate role in protecting the weak, and they will ask: "What on earth were they thinking? What on earth were they thinking?"

I would reverse the judgment of the district court.

MICHAEL, Circuit Judge, dissenting:

The majority's decision to uphold the Virginia abortion ban challenged here (the Virginia Act) marks an alarming departure from settled Supreme Court precedent: it sanctions an unconstitutional burden on a woman's right to choose. *Gonzales v. Carhart* (*Carhart II*), 550 U.S. 124 (2007), and long-standing precedent explicitly reaffirmed in that case hold that the Constitution protects a woman's right to choose the standard dilation and evacuation (D&E) procedure employed in the vast majority of pre-viability second trimester abortions. The Virginia Act violates the Constitution because it exposes *all* doctors who perform the standard D&E to prosecution, conviction, and punishment. The Act does this by imposing criminal liability on *any* doctor who sets out to perform a standard D&E that by accident becomes an intact D&E.

The Supreme Court in *Carhart II* considered a facial challenge to the federal criminal statute that prohibits the intact D&E procedure. The Court upheld the federal statute based on its requirement that a doctor *intend at the outset* to perform an intact D&E. This intent requirement, the *Carhart II* Court emphasized, precludes liability from attaching to an *accidental* intact D&E. *Carhart II* thus affords constitutional protection to a doctor whose intent at the outset is to perform a standard D&E, even when the doctor must complete the abortion by performing an intact D&E. This doctor, in other words, is shielded from criminal liability under the Federal Act. The Virginia Act provides a doctor with no such protection.

The majority itself concedes that "the Virginia Act is broader in scope than the federal statute, covering accidental

intact D&Es." *Ante* at 22. The majority, however, claims that the Virginia Act is nonetheless constitutional because it provides a doctor with "affirmative defenses" that purportedly could be used to argue for jury acquittal in a criminal trial. As I will explain, those hollow "defenses" do not offer doctors who set out to perform constitutionally protected standard D&Es any realistic or reliable option. No doctor would be foolish enough to take the treacherous path suggested by the majority, for it would almost certainly lead to the commission of a crime under the Virginia Act. Because of the real fear of criminal liability, doctors in Virginia will stop performing standard D&Es altogether. This result places an undue burden on a woman's right to obtain a pre-viability second trimester abortion—a constitutional right repeatedly reaffirmed by the Supreme Court.

For similar reasons, the majority is wrong when it says that no facial challenge lies in this case because the accidental intact D&E does not occur with sufficient frequency. The majority overlooks the fact that the Virginia Act subjects a doctor to the risk of criminal liability *every time* he sets out to perform a standard D&E. This risk is real, as the Supreme Court recognized in *Carhart II*. And because this risk is present during every standard D&E, facial invalidation of the Virginia Act is required.

I respectfully dissent.[1]

### I.

### A.

The Virginia Act criminalizes "partial birth infanticide," a new, non-medical term chosen by the legislature. Va. Code

---

[1]This dissent incorporates some of the rationale contained in the now vacated panel opinion, *Richmond Med. Ctr. for Women v. Herring*, 527 F.3d 128 (4th Cir. 2008).

Ann. § 18.2-71.1(A). This crime occurs when (1) a fetus "has been . . . substantially expelled or extracted from its mother" (that is, has emerged to an anatomical landmark) and exhibits "evidence of life," (2) thereafter, but before the fetus is "completely extracted or expelled," a person "knowingly performs" "any deliberate act that . . . is intended to kill" the fetus, and (3) the deliberate act "does kill" the fetus, "regardless of whether death occurs before or after extraction or expulsion." *Id.* § 18.2-71.1(A)-(D). Anatomical landmarks (trunk past the navel in breech presentation or fetal head "outside the body of the mother" in head-first presentation) establish the point at which the Act applies.[2] *Id.* § 18.2-71.1(D). Partial birth infanticide is a class four felony that is punishable by a prison term of up to ten years and a fine of up to $100,000. *Id.* §§ 18.2.71.1, 18.2-10(d). The Act does not include an exception to preserve a woman's health, but it does have a "prevention of death" exception. *Id.* § 18.2-71.1(E).

## B.

Plaintiff William G. Fitzhugh, M.D., is a board certified obstetrician and gynecologist who is licensed to practice medicine in Virginia. Dr. Fitzhugh performs only pre-viability abortions, through twenty weeks of pregnancy. He performs some abortions on the premises of plaintiff Richmond Medical Center for Women. For second trimester abortions, Dr. Fitzhugh usually employs the standard D&E method.

Dr. Fitzhugh explains that his patients who seek second trimester abortions "do so for a variety of reasons":

> Some women have pregnancies complicated by severe or fatal fetal anomalies diagnosed in the second trimester; some are pregnant as a result of rape, incest or failed contraception; some are in need of

---

[2] I understand "outside the body of the mother" to mean beyond the vaginal opening.

abortion services to protect their health and lives; some are unaware of their menstrual cycle or have irregular menstrual cycles; and some of the very young are unaware of or dismiss the possibility of pregnancy. Some have delayed obtaining an abortion for a wide range of other personal reasons.

Fully one-third of the 225 second trimester abortions Dr. Fitzhugh performs "are because of a genetic abnormality to the fetus, a bad condition of the fetus, or a medical condition of the woman."

Dr. Fitzhugh asserts that the Virginia Act exposes a doctor to criminal liability every time he attempts a D&E abortion because the procedure always poses the risk of unintentional intact delivery of the fetus to one of the anatomical landmarks specified in the Act. The district court agreed with Dr. Fitzhugh, holding that the Virginia Act is unconstitutional because (among other things) it imposes an undue burden on a woman's right to choose an abortion for the following reason: "The plain language of the Act bans previability D&Es and would cause those who perform such D&Es to fear prosecution, conviction and imprisonment." *Richmond Med. Ctr. for Women v. Hicks*, 301 F.Supp.2d 499, 515 (E.D. Va. 2004).

## II.

Because the majority is reversing the award of summary judgment to Dr. Fitzhugh and directing the entry of judgment in favor of the Commonwealth of Virginia, Dr. Fitzhugh's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The D&E procedure is by far the most common method of pre-viability second trimester abortion, used in approximately ninety-five percent of cases. In this procedure the doctor dilates the woman's cervix and uses suction and forceps to

remove the fetus. The doctor also uses instruments to hold the vagina open and to gain access to the cervix and uterus. As the doctor uses forceps to pull the fetus out of the cervix during a D&E, friction usually causes parts of the fetus to break off or disarticulate. As a result of disarticulation the fetus is removed in pieces.[3] Throughout the process, the fetus may show signs of life, such as a heartbeat, although disarticulation ultimately causes fetal demise.

A variation of the standard D&E procedure, often termed "intact D&E," occurs when the doctor removes the fetus intact or largely intact. A doctor intending to perform an intact D&E uses certain methods, such as serially dilating the cervix or rotating the fetus as it is pulled out of the uterus, to increase the likelihood of intact delivery. In an intact D&E the fetal skull is typically too large to pass through the cervix, and the doctor compresses or collapses the skull to complete the abortion.

As the Supreme Court has recognized—and the undisputed record in this case establishes—a doctor performing standard D&Es will, in a small fraction of cases, unintentionally (or accidentally) deliver the fetus intact to or past an anatomical landmark. *See Carhart II*, 550 U.S. at 155. The potential is always present for an accidental intact delivery to an anatomical landmark during a standard D&E because a doctor cannot predict at the outset of the procedure when, or even whether, a fetus will disarticulate during evacuation. Fetal disarticulation is influenced by several factors beyond the doctor's control, including the precise level of cervical dilation, the condition of the uterus and the cervix, the size and orientation of the fetus, and fetal fragility. While the fetus usually disarticulates as it is pulled through the cervix, on occasion the factors just noted may cause it to emerge intact or substantially intact. Dr. Fitzhugh does not intentionally perform intact

---

[3]The Virginia Act uses the word "dismemberment" rather than "disarticulation."

D&Es; however, when he performs standard D&Es, a small fraction of those cases result in intact extraction of the fetus to an anatomical landmark prior to completion of the abortion.

Once a fetus emerges to an anatomical landmark despite the doctor's intent to perform a standard D&E, steps must be taken to complete the abortion. Thus, in a breech presentation, after the fetus emerges to the navel (an anatomical landmark), the doctor will continue to pull to extract the fetus. This force and traction usually causes the fetus to disarticulate, leading to its demise. In addition, the fetal skull can become lodged in the cervix without disarticulation, as it would in an intentional intact D&E. In this situation the doctor will have to compress or collapse the fetal skull to remove it through the cervix and complete the abortion, another act that causes fetal demise.

Dr. Fitzhugh explained in detail why he would be in constant risk of violating the Virginia Act in his practice. First, "about one, two, three [times] a year," or "[l]ess than a half" percent of the time, the fetus (in breech position) is removed intact with the neck lodged in the cervix. At this point, the fetus is outside of the woman's body to the navel or beyond, and Dr. Fitzhugh must compress or collapse the skull to complete the abortion. Second, about ten percent of the time the fetus (in breech position) emerges from the cervix intact to the navel or beyond, but the neck has not reached the cervical opening.[4] In this situation Dr. Fitzhugh continues to pull on the fetus, and it usually disarticulates. Of this ten percent category of cases, there is a small percentage in which the fetus up to the navel has emerged from the vaginal opening (outside of

---

[4]The majority fails in its effort to discredit Dr. Fitzhugh when it notes that he had no specific recollection of the last instance in which this "scenario occurr[ed]" in his practice. *Ante* at 11. When asked whether it "[w]as within the past year," Dr. Fitzhugh answered, "Oh, yes," adding that he simply could not recall the exact times. He was confident about the ten percent occurrence rate.

the woman's body). Although Dr. Fitzhugh did not estimate the number or percentage of times he is confronted with such an unintentional intact emergence to the navel, he emphasized that the action he takes at that point to complete the abortion —action that occurs outside of the woman's body—usually results in fetal disarticulation and demise.

In sum, when a doctor is faced with the accidental situation of the intact extraction of the fetus to an anatomical landmark, he has no realistic option short of completing the abortion in a manner that causes fetal demise. *See Carhart II*, 550 U.S. at 154 (To complete an accidental intact D&E, the "doctor[ ] will commit an overt act that kills the partially delivered fetus.")

### III.

The Supreme Court has instructed us to assess the Virginia Act in light of *Carhart II*. There, the Court based its decision to uphold the federal statute on the statute's requirement that the crime of partial birth abortion cannot occur unless the doctor intends at the outset of the procedure to perform an intact D&E. The majority readily acknowledges that the Virginia Act lacks this intent requirement, and it fails to muster an argument that saves the Act under *Carhart II*. Without the protection of the intent-at-the-outset requirement, the Virginia Act exposes a doctor who performs standard D&Es to criminal liability for an *accidental* intact D&E. As a result, a doctor's only safe course is to stop performing standard D&Es altogether. This outcome imposes an undue burden on a woman's right to obtain a standard D&E abortion in violation of the Constitution.

### A.

In *Carhart II* the Court considered the constitutional limits on the regulation of abortion procedures and held that the federal Partial-Birth Abortion Ban Act of 2003 (the Federal Act),

18 U.S.C. § 1531, is constitutional "as a facial matter." 550 U.S. at 168. The Court began its analysis by quoting the summary of governing principles set forth in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992):

> "It must be stated at the outset and with clarity that [the] essential holding [of *Roe v. Wade*, 410 U.S. 113 (1973)], the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each."

*Carhart II*, 550 U.S. at 145 (quoting *Casey*, 505 U.S. at 846 (opinion of the Court)). In *Carhart II* the Court also adhered to *Carhart I*'s central holding: a law that effectively prohibits "[standard] D&E procedures, the most commonly used method for performing previability second trimester abortions," imposes "an undue burden upon a woman's right to make an abortion decision," in violation of the Constitution. *Carhart I*, 530 U.S. 914, 945-46 (2000); *see Carhart II*, 550 U.S. at 150-54.

The *Carhart II* Court, after reviewing the text of the Federal Act, concluded that the statute "prohibits a doctor from intentionally performing an intact D&E," but "does not pro-

hibit the [standard] D&E procedure in which the fetus is removed in parts." *Carhart II*, 550 U.S. at 150. The Court's constitutional analysis proceeded as follows. First, the Court considered whether the Federal Act was void for vagueness or overly broad. Here, the Court was guided by the Federal Act's "defin[ition of] the unlawful abortion in explicit terms." *Id.* at 147. Specifically, to violate the Federal Act, a doctor must (1) vaginally deliver a living fetus; (2) deliver the fetus to a clearly described anatomical landmark (trunk past the navel in a breech presentation or entire head outside in a head-first presentation); and (3) perform a distinct "'overt act, [an act] other than completion of delivery, that kills the partially delivered living fetus.'" (quoting 18 U.S.C. § 1531(b)(1)(B)). *Id.* at 147-48. The Court emphasized that the Federal Act contains intent requirements "concerning all the actions involved in the prohibited abortion." *Id.* at 148. Thus, the Federal Act requires that the doctor (1) "deliberately and intentionally" deliver the fetus to a specific anatomical landmark (2) "for the purpose of performing an overt act that the [doctor] knows will kill [it]." *Id.* (quoting 18 U.S.C. § 1531(b)(1)(A)) (alteration in original). Through this precise definition the Federal Act makes it a crime for a doctor to intentionally set out to perform and then to perform an intact D&E abortion.

In rejecting the vagueness challenge, the Court concluded that the Federal Act's intent requirements provide doctors with a clear description of the prohibited conduct and prosecutors with objective criteria that serve to limit their discretion. 550 U.S. at 148-150. The Court then concluded that the Federal Act was not overly broad because it only "prohibits a doctor from intentionally performing an intact D&E." *Id.* at 150. Again, the Court found that the Federal Act's reach was limited by the features of the unlawful abortion enumerated above. *Id.* at 150-56. Specifically, the Federal Act's "intent requirements . . . preclude liability from attaching to an accidental intact D&E." *Id.* at 155. Thus, a doctor *never* runs the risk of violating the Federal Act when he sets out to perform a standard D&E, even though the fetus might be delivered to

one of the anatomical landmarks "by accident or inadvertence." *Id.* at 148. As a result, the scope of the Federal Act is carefully limited to prohibit intentional intact D&E, thereby allowing access to the more widely used standard D&E procedure. *Id.* at 150-56.

Second, the Court considered whether the Federal Act was passed with the impermissible purpose of placing "'a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Id.* at 156 (quoting *Casey*, 505 U.S. at 878 (plurality opinion)). The Court determined that Congress, in carefully targeting its restriction to the intact D&E, was engaging in a legitimate use of its authority to "regulat[e] the medical profession in order to promote respect for life, including life of the unborn." *Id.* at 158.

Third, the Court considered whether the Federal Act imposed a substantial obstacle to late-term, pre-viability abortions by failing to include an exception to preserve the health of the woman. *Id.* at 161-67. The Federal Act contains a life exception, 18 U.S.C. § 1531(a), but not a health exception. The Court noted that "whether the Act creates significant health risks for women [was] a contested factual question." *Id.* at 161. As a result, the Court held, "[t]he [Federal] Act is not invalid on its face" for lack of a health exception because "there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures," such as the standard D&E, "that are considered to be safe alternatives." *Id.* at 167. In the face of this medical uncertainty, only as-applied challenges to the Federal Act's lack of a health exception may be pursued. *Id.* at 167-68.

When the Virginia Act is measured against *Carhart II* and is compared to the materially different Federal Act, it becomes clear that the Virginia Act effectively prohibits the (pre-viability) standard D&E procedure, in violation of the Constitution.

### B.

To repeat, the Virginia crime of "partial birth infanticide" occurs when (1) a fetus "has been . . . substantially expelled or extracted from its mother" (that is, has emerged to an anatomical landmark) and exhibits "evidence of life," (2) thereafter, but before the fetus is "completely extracted or expelled," a person "knowingly performs" "any deliberate act that . . . is intended to kill" the fetus, and (3) the deliberate act "does kill" the fetus, "regardless of whether death occurs before or after extraction or expulsion." Va. Code Ann. § 18.2-71.1(A)-(D). The Virginia Act specifies anatomical landmarks (the trunk past the navel or the fetal head "outside the body of the mother") that establish the point at which the Act applies. *Id.* § 18.2-71.1(D). The Federal Act uses the same anatomical landmarks. 18 U.S.C. § 1531(b)(1)(A).

The Virginia Act lacks the intent and distinct overt act requirements that were central to the Supreme Court's decision to uphold the Federal Act in *Carhart II*. Indeed, the Virginia General Assembly intentionally omitted these requirements from the final version of the Virginia Act. As originally introduced in the House of Delegates, House Bill No. 1541 contained both an intentional delivery requirement and a distinct overt act requirement that used precisely the same language as the Federal Act. *Compare* H.B. 1541, 2003 Leg. Reg. Sess. (Va. 2003) (Introduced), *available at* http://leg1.state.va.us/cgi-bin/legp504.exe?031+ful+HB1541+pdf *with* 18 U.S.C.S. § 1531(b)(1). By the time the legislative process was complete, however, the General Assembly had rejected the intentional delivery and distinct overt act requirements and had opted instead for the language in the current Act. *See* H.B. 1541-H2, 2003 Leg., Reg. Sess. (Va. 2003) (House Substitute), available at http://legl.state.va.us/cgi-bin/legp504exe ?031+ful+HB1541H2+pdf; Va. Code Ann. § 18.2-71.1. Through this process the legislature demonstrated its intent that the Virginia Act criminalize accidental intact D&Es in which the act that causes fetal demise occurs simul-

taneously with completing the extraction. Specifically, the Virginia General Assembly chose to make it a crime when a doctor faces an accidental intact D&E and must perform a deliberate act (applying traction or compressing the skull) that causes fetal demise in order to complete the procedure. As a result, the Virginia Act, unlike the Federal Act, unconstitutionally subjects all doctors who perform standard D&Es to criminal liability. The key differences between the two statutes, discussed more fully below, confirm the broader, unconstitutional reach of the Virginia Act.

1.

As I have pointed out, the Federal Act "contains scienter requirements concerning all the actions involved in the prohibited abortion," including both a requirement that the doctor intentionally deliver the fetus to an anatomical landmark *and* a requirement that this delivery be for the purpose of performing the overt act that the doctor knows will cause fetal demise. *Carhart II*, 550 U.S. at 148; *see* 18 U.S.C. § 1531(b)(1)(A). As the Supreme Court observed, under the Federal Act "[i]f either intent is absent, no crime has occurred." *Carhart II*, 550 U.S. at 148. These intent requirements were crucial to *Carhart II*'s holding that the Federal Act does not prohibit the standard D&E and is thus constitutional. *Id.* at 150. As the Court explained, "[t]he Act's intent requirements . . . limit its reach to those physicians who carry out the intact D&E after intending to undertake both [the delivery to an anatomical landmark and the distinct overt act] steps at the outset." *Id.* at 151. The Court rejected the argument that the Federal Act imposes criminal liability on doctors who complete an abortion after accidental intact delivery to an anatomical landmark. This argument, the Court said, failed to "take account of the Act's intent requirements, which preclude liability from attaching to an accidental intact D&E." *Id.* at 155.

The Virginia Act lacks any such protection, as the majority acknowledges. Instead, the Act's only intent requirement

relates to the overt act: the doctor is prohibited from "know-ingly perform[ing] . . . any deliberate act that . . . is intended to kill [and does kill] a human infant who has been born alive, *but who has not been completely extracted or expelled from its mother.*" Va. Code Ann. § 18.2-71.1(A), (B) (emphasis added). In contrast to the Federal Act, the Virginia Act omits any mention of the doctor's intent *at the commencement of* the procedure, using the phrase "*has been* born alive" to describe the delivery and identify the point at which any crime could begin. Thus, under the Virginia Act partial birth infanticide occurs only *after* delivery to an anatomical landmark, that is, after the infant "has been born alive." The intent requirement does not attach to the commencement of the abortion, but rather to the subsequent deliberate act (the prohibited act) that results in fetal demise.

The majority agrees that the Virginia Act does not require intent at the outset and therefore applies to an accidental intact D&E. In the majority's words,

> The Virginia Act's scienter is measured only after partial delivery of the "human infant who has been born alive" and not at the commencement of the abortion procedure, as under [the Federal Act] . . . . [T]he doctor's intent *before* commencing the D&E procedure is not determinative of scienter for pur-poses of criminal liability under the Virginia Act. The Virginia Act applies with equal force to a doctor who intends to perform a prohibited *intact* D&E pro-cedure, intentionally extracts the fetus past an ana-tomical landmark, and then performs a "deliberate act" to kill the fetus, and to a doctor who intends to perform a permissible *standard* D&E procedure, accidentally extracts the fetus past an anatomical landmark, and then performs a deliberate act to kill the fetus and complete the abortion. In either event, however, we read the Virginia Act intent require-ment to require purpose, not mere knowledge, that a

specific act — taken after emergence to the anatomical landmark—will result in fetal demise.[5] Thus, the Virginia Act criminalizes both the intentional intact D&E and the accidental intact D&E where the necessary scienter is present and no affirmative defense is presented.

*Ante* at 22 (emphasis in original) (citation omitted). The Virginia Act cannot survive the majority's basic interpretation—an interpretation I agree with—that the Act applies to an accidental intact D&E. The Virginia Act must fall under *Carhart II*, for a doctor faced with an accidental intact delivery to an anatomical landmark has no "affirmative defense." He must either collapse the fetal skull, which causes fetal demise, or continue to pull (or apply traction), which usually causes disarticulation and fetal demise. In either case, he has committed a "deliberate act that . . . is intended to kill" the fetus, thereby violating the Virginia Act. This doctor, confronted with an unintentional delivery to an anatomical landmark, does not have the option that saved the Federal Act, that is, the option to "complete[] [the] abortion by performing an intact D&E" without violating the law. *Carhart II*, 550 U.S. at 155. The option to complete the abortion is available under the Federal Act because *intent at the outset* to perform an intact D&E is required. The Virginia Act's failure to provide that central requirement is by itself sufficient to render the Act unconstitutional.

2.

There is a second key difference between the Virginia Act and the Federal Act. Although both statutes require that the doctor perform a deliberate act to cause fetal demise after

---

[5]The majority's argument that the Virginia Act's intent requirement can be read "to require purpose, not mere knowledge" will not protect a doctor faced with accidental delivery to an anatomical landmark. *See infra* at 54 n.8.

delivery to an anatomical landmark, the Federal Act explicitly requires that this act be *distinct* from completing delivery. The Virginia Act lacks such a distinction. *Compare* Va. Code Ann. § 18.2-71.1(B) (requiring "any deliberate act") *with* 18 U.S.C. § 1531(b)(1)(B) (requiring an "overt act, other than the completion of delivery"). As the Supreme Court emphasized, "[t]his distinction matters because, unlike intact D&E, standard D&E does not involve a delivery followed by a fatal act." *Carhart II*, 550 U.S. at 153. The Federal Act's requirement of an overt act distinct from completion of delivery excludes standard D&Es in which fetal demise results from disarticulation that occurs during the delivery. The Federal Act, in other words, requires an additional act such as compressing the fetal skull before liability can attach. In contrast, a doctor is liable under the Virginia Act for *completing* the evacuation of a fetus after it has emerged substantially intact if disarticulation (causing fetal demise) occurs during this process. *See Carhart I*, 530 U.S. at 939, 943-44 (striking down abortion ban because it failed to distinguish between delivery and the act that terminated the fetus).

The majority erroneously claims that the Virginia Act's language, "deliberate act that is intended to kill a human infant who has been born alive," Va. Code Ann. § 18.2-71.1(B), makes a distinction between an act intended to terminate the fetus and an act taken to complete delivery. *Ante* at 25-26. Specifically, the majority states that the use of the words "has been born alive" "indicates that the live birth . . . must have taken place *prior* to the 'deliberate act' that kills the fetus." *Id.* (emphasis in original). This statement ignores that a fetus that "has been born alive" is defined to include a fetus that has been delivered to an anatomical landmark. Va. Code Ann. § 18.2-71.1(C), (D). A fetus that has only emerged intact to a landmark has not yet been completely delivered. *Any* act taken thereafter to complete delivery that causes fetal demise is a deliberate act that violates the Virginia Act. For example, in the case of an intact breech presentation to the navel, that deliberate act would be the further pulling (or

applying traction) to extract the fetus, which usually causes disarticulation and fetal demise. The majority's assertion that "the act that results in the demise and the emergence to the anatomical landmark cannot be one single action" is beside the point, because under the Virginia Act liability does not attach until *after* the fetus has emerged intact to a landmark. Nor is the majority's reasoning saved by its reference to Va. Code § 18.2-71.1(B), which protects a doctor from liability for "completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered." For this provision to provide protection, the fetus must be living and intact at the completion of delivery. The protection has no bearing here as it does not protect a doctor when he fails to *completely* deliver a *living* infant because disarticulation has occurred before delivery is completed. *See infra* note 7. In short, the Virginia Act does not require that the deliberate (or overt) act be distinct from completing delivery for liability to attach.

### 3.

The absence of the intent-at-the-outset and distinct overt act requirements in the Virginia Act expand its reach substantially beyond that of the Federal Act. Every time a doctor intends at the beginning to perform a standard D&E, he runs the real risk of accidentally delivering an intact fetus to an anatomical landmark. As the Supreme Court recognizes, and the record in this case confirms, an accidental intact D&E occurs "in a small fraction of the overall number of D&E abortions." *Carhart II,* 550 U.S. at 155. The Virginia Act imposes criminal liability in all such cases because a doctor faced with an accidental intact D&E must take steps to complete the abortion, which results in fetal demise. The doctor commits a crime even though he intended at the outset to perform the legal, standard D&E procedure.

### C.

The majority argues that the lack of an intent-at-the-outset requirement does not render the Virginia Act unconstitutional

because the Act "sufficiently cabins the narrow set of situations in which a doctor could incur criminal liability." *Ante* at 22. This argument, however, ignores both the critical nature of the intent requirement and the lack of realistic options for avoiding criminal liability under the Virginia Act when a doctor is faced with an accidental intact delivery to an anatomical landmark.

In claiming that the Virginia Act is "plain as to how [ ] liability may be avoided," the majority quotes a passage from *Carhart II* in which the Supreme Court began its explanation as to why the Federal Act was not unconstitutionally vague. *Id.* at 23. The Court concluded that the Federal Act "provides doctors of ordinary intelligence a reasonable opportunity to know what is prohibited": "[d]octors performing D&E will know that if they do not deliver a living fetus to an anatomical landmark they will not face criminal liability." 550 U.S. at 149 (internal quotation mark omitted). The majority, however, has not included *Carhart II*'s very next paragraph, which follows below and explains how important the Federal Act's intent requirement was to the Court's conclusion:

> This conclusion is buttressed by the intent that must be proved to impose liability. The Court has made clear that scienter requirements alleviate vagueness concerns. The Act requires the doctor deliberately to have delivered the fetus to an anatomical landmark. Because a doctor performing a D&E will not face criminal liability if he or she delivers a fetus beyond the prohibited point by mistake, the Act cannot be described as a trap for those who act in good faith.

*Carhart II*, 550 U.S. at 149-50 (internal quotation marks and citations omitted). *Carhart II* thus makes clear that an intent-at-the-outset requirement was crucial to ensure that a doctor setting out to perform a constitutionally protected standard D&E would not face criminal punishment.

The majority claims that even without the initial intent requirement, the Virginia Act "makes clear to the doctor the permissible avenues for avoiding criminal liability" when "the fetus accidentally emerges intact to an anatomical landmark but is not completely expelled." *Ante* at 24. The majority refers to these avenues as "affirmative defenses." *Id.* at 8, 22, 24. As it must, the majority addresses the breech presentation when the fetal head is lodged in the cervix. As the Supreme Court recognized, this is "the usual intact D&E," 550 U.S. at 138, with the trunk extracted "past the anatomical landmark," *id.* at 151. In this situation, the majority says, the mother's life is at risk, which allows a doctor to invoke the Virginia Act's life exception, Va. Code § 18.2-71.1(E), and "complete the D&E procedure . . . to save the mother's life." *Ante* at 24. Completion of the intact D&E would be permitted, notwithstanding the life exception's requirement that the doctor "take[ ] every medically reasonable step, consistent [with the] procedure [necessary to prevent the woman's death], to preserve the life and health of the infant." Va. Code Ann. § 18.2-71.1(E). In any event, to complete the intact D&E, it would be necessary for the doctor to compress the fetal skull, which would be permissible to save the woman's life. But applying the life exception in this manner would render the Virginia Act largely meaningless by permitting the very procedure the Act was meant to prohibit: an intact D&E when, after an intact delivery to the navel, the doctor must compress the fetal skull to remove the fetus. Under the majority's interpretation, because the Act's prohibition against partial birth infanticide does not apply until after delivery to an anatomical landmark, a doctor would be allowed to deliver (intentionally or unintentionally) a fetus until its skull becomes lodged; at this point both the Act's prohibition and its life exception would apply; and the life exception would immediately cancel out the Act's prohibition, allowing the doctor to deliberately collapse the skull to complete the abortion. This simply cannot be the purpose of the life exception.[6]

---

[6]Despite the majority's argument, the occurrence rate of accidental intact D&Es has no bearing on the above analysis. *See ante* at 20 n.4 (stat-

The majority also states that "where the mother's life is not in danger and the fetus has been partially expelled to an anatomical landmark, the [Virginia Act] clearly prohibits the doctor from completing the abortion by taking a deliberate act to kill the fetus." *Ante* at 25. Here, the majority is referring to the situation when the fetus is partially extracted to a landmark, but the head is not lodged. In that instance, according to the majority, the doctor's only option is "to attempt to safely complete delivery of the fetus." *Id.* at 25. Notwithstanding the majority's apparent suggestion to the contrary, only a live, intact delivery will prevent criminal liability.[7] Again, the Virginia Act, unlike the Federal Act, lacks the requirement of a distinct overt act that is something other than an act taken to complete delivery. When a doctor is faced with a fetus partially emerged to a landmark (without the head being lodged), he must perform the deliberate act of continuing to apply traction in order to remove the fetus. As the record establishes,

---

ing that an accidental intact breech delivery with the fetal head lodged in the cervix is "rare"). The point is that the majority, in an attempt to save the Virginia Act by carving out a defense for the accidental intact D&E, has interpreted the life exception in a way that would also exempt the typical intentional intact D&E. This construction drains the Act of any real meaning.

[7]In seeking to support its suggestion that attempting "to safely complete delivery" will absolve the doctor, the majority cites an exception in § 18.2-71.1(B) of the Virginia Act. *Ante* at 25 n.6. To repeat, this exception provides that partial birth infanticide does not include "completing delivery of a living human intact and severing the umbilical cord of any infant who has been completely delivered." Va. Code Ann. § 18.2-71.1(B). This exception does not aid the doctor facing an accidental intact delivery to an anatomical landmark because that doctor has virtually no chance of completing a live delivery of the fetus. Moreover, the umbilical cord often disarticulates in the process of extracting a pre-viability fetus. The exception is therefore designed for another purpose, that is, to ensure that doctors will not face liability for committing the deliberate act of severing the umbilical cord after completely delivering a living infant. The exception thus protects obstetricians who deliver living infants, not doctors who perform abortions. *See Richmond Med. Ctr.*, 527 F.3d at 141-42 (vacated) (explaining the limited coverage of the exception).

this traction almost always results in disarticulation and fetal demise. Of course, criminal intent to cause a result may be inferred if a person "knows that that result is practically certain to follow from his conduct." 1 W. LaFave, *Substantive Criminal Law* § 5(a) (2d ed. 2003). Here, the doctor knows that his deliberate act of continuing to apply traction is practically certain to result in the termination of the fetus, which means that he has committed a "deliberate act . . . intended to kill the infant" or fetus, in violation of the Virginia Act.[8]

Finally, the majority observes that in the circumstance "where a standard D&E results in a full, intact birth"—a very rare circumstance—the "doctor will incur liability [under the Virginia Act] only if [he] performs any deliberate act 'intended to kill' the fetus that has just been completely expelled." *Ante* at 28. This observation is not relevant to this case because Dr. Fitzhugh does not contend that he would have to commit an overt act in the very rare situation in which the fetus is completely delivered intact.

The majority's analysis offers no realistic options for the doctor who would wish to continue performing legal, standard D&E abortions. That doctor will not be assured by the majority's implausible assertion that he has an "affirmative defense to any criminal liability." *See ante* at 24. Nor will he have any confidence that the Supreme Court of Virginia would agree with the majority's "affirmative defense" analysis. That doctor will stop performing standard D&Es altogether.

---

[8]The majority's attempt to "read the Virginia Act intent requirement to require purpose, not mere knowledge, that a specific act . . . will result in fetal demise" affords a doctor no additional protection in a criminal trial. *Ante* at 22; *see also ante* at 25 n.6. The Virginia Act makes it a felony to "*knowingly* perform[ ]" "*any* deliberate act that . . . is *intended* to kill" a partially extracted fetus. Va. Code Ann. § 18.2-71.1(A), (B) (emphasis added). The Act's intent language will allow a Commonwealth of Virginia trial court to instruct a jury that "it is permissible to infer that every person *intends* the natural and probable consequences of his or her acts." *Schmitt v. Commonwealth*, 547 S.E.2d 186, 198 (Va. 2001) (emphasis added).

D.

Because a doctor violates the Virginia Act when a standard D&E results in an accidental (partial) intact delivery and he must then perform an act causing fetal demise, he subjects himself to the risk of criminal liability at the outset of *every* standard D&E. The only way for a doctor to avoid this risk is to refrain from performing all standard D&E procedures. As a result, the Virginia Act imposes an undue burden upon a woman's right to choose a pre-viability second trimester abortion. The Act is therefore unconstitutional.

IV.

Because an accidental intact D&E occurs in only "a small fraction of the overall number of D&E abortions," *Carhart II* at 156, the majority concludes that a facial challenge is not appropriate. The majority, however, focuses on the wrong fraction in reaching this conclusion. The majority considers how often a standard D&E becomes an accidental intact D&E, when the critical question is how often (and whether) the Virginia Act imposes a burden on a woman's ability to obtain a (pre-viability) standard D&E abortion. It is the latter inquiry, not the former, that should ultimately guide our decision as to whether a facial challenge can be sustained. The record here establishes that the Virginia Act threatens criminal liability—and thus imposes a burden—in every case that calls for a standard D&E. That is 100 percent of those cases, more than sufficient to sustain a facial challenge.

In arguing that a facial challenge cannot be "successfully mount[ed]" in this case, the majority begins by noting the Supreme Court's oft-stated "preference for avoiding facial challenges." *Ante* at 12, 15. Notwithstanding the Court's professed preference, the Court has allowed facial challenges more often "than generally recognized." Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1322 (2000) (citing Michael C.

Dorf, *Facial Challenges to State and Federal Statutes* (Facial Challenges), 46 Stan. L. Rev. 235 (1994)). Indeed, it is well established that a facial challenge alleging overbreadth is an appropriate vehicle for seeking the invalidation of a statute regulating abortion. *See Sabri v. United States*, 541 U.S. 600, 609-10 (2004) (citing *Carhart I*, 530 U.S. at 938-946).

As recently as 2007 in *Carhart II* the Court entertained a facial (overbreadth) challenge to the Federal Act prohibiting partial birth abortion. After conducting a careful analysis of the text of the Federal Act to determine its "operation and effect," the Court concluded that the statute did not impose an undue burden through overbreadth because it did not "prohibit the vast majority of D&E abortions." *Carhart II*, 550 U.S. at 156. The Court did require the use of an as-applied challenge in the limited context of an attack on the Federal Act's lack of a health exception, concluding that "the nature of the medical risk can be better quantified and balanced" in an as-applied challenge. *Id.* at 167-68. *Carhart II*, however, did not question the general validity of facial challenges to abortion statutes.

There is a compelling reason for allowing facial challenges in the abortion context. *See Sabri*, 541 U.S. at 609-10 (recognizing the validity of facial attacks in a "few settings," including abortion, based "on the strength of specific reasons weighty enough to overcome [the Court's] well-founded reticence" to entertain such attacks). There is simply insufficient time in an individual case to pose an as-applied challenge to a statute regulating abortion. For example, Dr. Fitzhugh only performs D&E abortions during six weeks of a pregnancy, from fourteen weeks through twenty weeks. That narrow period would not realistically afford a pregnant woman or Dr. Fitzhugh enough time to obtain a judgment that an abortion regulation is invalid as applied. Mandatory case-by-case challenges, as the majority advocates, would require a doctor to violate the Virginia Act and then raise the constitutional defense during his criminal prosecution. As I have already

emphasized, rather than take such a perilous course, a doctor would surely stop performing D&E abortions altogether. "Thus, requiring that challenges to an overbroad statute prohibiting abortion proceed on a case-by-case [or as-applied] basis will chill a woman's right to choose an abortion." Dorf, *Facial Challenges*, 45 Stan. L. Rev. at 271.

The majority appears ultimately to recognize that facial challenges are valid in the abortion context, but says there is "uncertainty regarding the appropriate criteria for entertaining facial challenges" in such cases. *Ante* at 17. The majority advances three alternatives: (1) the "no set of circumstances" standard, *see United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge "must establish that no set of circumstances exists under which the Act would be valid"); (2) the "plainly legitimate sweep" standard, *see Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1190 (2008) ("a facial challenge must fail where the statute has a plainly legitimate sweep") (quotation marks omitted); and (3) the "large fraction of [relevant] cases" standard, *see Casey*, 505 U.S. at 895 (facial challenge sustained because "in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion").

The "no set of circumstances" and the "plainly legitimate sweep" standards are not justifiable options because the Supreme Court has not adopted either standard in the abortion context. In *Casey* (1992) the Court used the "large fraction of [relevant] cases" standard. 505 U.S. at 895. Later, in *Carhart I* (2002) the Court did not refer to either the "no set of circumstances" or "plainly legitimate sweep" standard in holding an abortion ban statute unconstitutional on its face because it imposed an undue burden on a woman's ability to choose a standard D&E abortion. *Carhart I*, 530 U.S. at 945-46. And, most recently, the Court in *Carhart II* (2007) declined specifically to endorse the "no set of circumstances" standard, stating that the debate about the proper burden need not be

resolved. 550 U.S. at 167. The *Carhart II* Court went on to apply *Casey*'s standard, holding that the plaintiffs were unable to "demonstrate[ ] that the [Federal] Act would be unconstitutional in *a large fraction of relevant cases*." *Id.* at 167-68 (citing *Casey*, 505 U.S. at 895) (emphasis added).

Here, the majority contends that facial invalidation of the Virginia Act is not appropriate under any standard, not "even under the more relaxed 'large fraction of the cases' test applied in *Casey*." *Ante* at 17; *see ante* at 20. The majority ultimately uses the *Casey* standard, but goes seriously astray in applying that standard.

The majority states that it is a "rare circumstance" in Dr. Fitzhugh's practice for a fetus in breech position to emerge intact to the navel. *Ante* at 19. This pronouncement ignores the fundamental question: how often in Dr. Fitzhugh's practice would the Virginia Act burden the right of a woman to choose a (pre-viability) D&E abortion. Dr. Fitzhugh performs about 225 pre-viability D&E abortions each year. One, two, or three times a year Dr. Fitzhugh is faced with the situation when the fetus (in breech position) accidentally emerges intact with the head lodged in the cervix. In this circumstance, the record establishes that Dr. Fitzhugh must compress the fetal skull, which terminates the fetus, in violation of the Virginia Act. In addition, Dr. Fitzhugh encounters, in what would also be a small fraction of cases, the circumstance when the fetus (again in breech position) emerges intact to the navel before the neck becomes lodged in the cervix. To complete removal, he must continue to apply traction that typically results in disarticulation; he lacks a way to assure a live, intact delivery and avoid liability under the Virginia Act.

The record therefore establishes that Dr. Fitzhugh, if he continued to perform D&E abortions, would commit a felony under the Virginia Act in the range of one to three times a year. To avoid this real and substantial risk, Dr. Fitzhugh, or any reasonable doctor, would have to stop performing D&Es

altogether. Again, the majority has not asked how often the Virginia Act will deter a doctor, such as Dr. Fitzhugh, from performing a standard D&E, the most common and safest abortion method during the second trimester of pregnancy. The answer is that a doctor would be at risk—and deterred— *in every case* that calls for a standard D&E. This result is more than sufficient to meet *Casey*'s "large fraction of relevant cases" standard, making a facial challenge appropriate.

## V.

At the very least Dr. Fitzhugh's as-applied challenge should be allowed and determined in his favor. Notwithstanding the majority's assertion to the contrary, *see ante* at 28, Dr. Fitzhugh has presented a thoroughly concrete set of facts establishing that the Virginia Act will operate unconstitutionally as applied to his individual D&E abortion practice. Dr. Fitzhugh has testified about the number of standard D&E abortions he performs each year. He has explained how in a small fraction of those cases the fetus accidentally emerges up to or past an anatomical landmark and he must take action that results in the demise of the fetus—action that violates the Virginia Act. This evidence will be no different if Dr. Fitzhugh is forced to file another lawsuit. On the current record Dr. Fitzhugh has established that if the Virginia Act goes into effect, his only options will be either to stop performing standard D&Es altogether or to continue performing the procedure and expose himself to career-ending criminal liability. Because our system does not put Dr. Fitzhugh to such a choice, *see Steffel v. Thompson*, 415 U.S. 452, 475 (1974), his as-applied challenge is ripe today. And that challenge should be sustained.

## VI.

Judge Wilkinson writes a concurrence to record his obvious disagreement with 36 years of Supreme Court jurisprudence on the issue of abortion. In doing so, he goes beyond our war-

rant as an inferior court, which is to apply the Constitution as the Supreme Court has interpreted it, and exceeds our role as a court of law, which is to adjudicate legal, not ethical, questions.

Moreover, the moral dimensions of the abortion debate are significantly more complex than Judge Wilkinson acknowledges. He fails, for example, to fully recognize that a woman's decision whether to bear a child involves "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy." *Casey*, 505 U.S. at 851. The freedom to make that decision ensures that a woman has control over her body and the conditions of her life, including her ability to protect and nurture her family, to overcome financial hardships, to leave abusive relationships, and to make critical decisions about her own health and well being. As the Supreme Court recognized in *Casey*, "[m]en and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage." 505 U.S. at 850. In the face of that disagreement, however, the Supreme Court went on to confirm a woman's constitutional right. Our duty here is to measure the Virginia Act against that precedent, not revisit the debate.

### VII.

I would affirm the district court's judgment declaring the Virginia Act unconstitutional on the ground that it imposes an undue burden on a woman's right to choose a pre-viability second trimester abortion.

Judge Motz, Judge Traxler, Judge King, and Judge Gregory join in this dissent.